Nicholas A. Coulson (SBN 358903)
Nick@CoulsonPC.com
Ellyn Gendler (SBN 305604)
EGendler@CoulsonPC.com
300 River Place Drive
Suite 1700
Detroit, Michigan 48207
T: (313) 644-2685
Nick@CoulsonPC.com

*Attorneys for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| WAEL AMIN, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> GKN AEROSPACE TRANSPARENCY SYSTEMS INC., GKN AEROSPACE NORTH AMERICA INC., GKN AEROSPACE, INC., GKN AEROSPACE US HOLDINGS LLC, GKN AEROSPACE SERVICES LIMITED, AND MELROSE INDUSTRIES PLC, <br><br> Defendants. | CASE NO.  8:26-cv-1434 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Wael Amin ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendants GKN Aerospace Transparency Systems Inc., GKN Aerospace North America Inc., GKN Aerospace, Inc., GKN Aerospace US Holdings LLC, GKN Aerospace Services Limited, and Melrose Industries plc ("Defendants"). Upon personal knowledge as to his own actions and upon information and belief and investigation of counsel as to all other matters, Plaintiff alleges as follows:

COULSON P.C.

1

**CLASS ACTION COMPLAINT AND JURY DEMAND**

**INTRODUCTION**

1.      Plaintiff brings this class action to seek orderly, comprehensive relief for the approximately 50,000 residents who were abruptly forced to evacuate their homes for a minimum of several days when Defendants caused a preventable industrial emergency.

2.      Defendants caused a painful situation for an entire community, but it was only due to a combination of the heroic efforts of emergency responders who placed themselves in harm's way and a stroke of sheer luck that the situation did not escalate into a catastrophic loss of lives and homes.

3.      While the worst was averted, Defendants' actions and failures nevertheless caused a wave of displacement and monetary loss that is breathtaking in its scope.

4.      Defendants—not the innocent people they needlessly placed at risk, forced from their homes, and subjected to enormous unexpected expenses—must bear the costs of these harmful actions and failures.

**PARTIES**

5.      Plaintiff Wael Amin is an individual and a citizen of the State of California, where he intends to remain, residing in Stanton, Orange County, California where he intends to remain.

6.      Defendant GKN Aerospace Transparency Systems Inc. ("GKN Transparency") is incorporated under the laws of California, and purports to have its principal place of business at 12122 Western Avenue, Garden Grove, California.

7.      Defendant GKN Aerospace Transparency Systems Inc. is the nominal owner, operator, and primary permit holder for GKN Aerospace's operations in Garden Grove, California.

8.      GKN Aerospace North America Inc. is a corporation organized under the laws of Delaware, with its claimed principal place of business in Irving, Texas. By and through it and the other intermediate Defendants, Melrose directs the management, capital allocation, and safety and environmental-compliance functions of GKN Transparency.

9.      Defendant GKN Aerospace, Inc. is organized under the laws of Delaware, with its claimed principal place of business in Irving, Texas. GKN Aerospace Inc. is the United States "operational" entity for GKN Aerospace's U.S. operations, and by and through it and the other

2

**CLASS ACTION COMPLAINT AND JURY DEMAND**

intermediate Defendants, Melrose directs the management, capital allocation, and safety and environmental-compliance functions of GKN Transparency.

10. Defendant GKN Aerospace US Holdings LLC is organized under the laws of Delaware, with its principal place of business located in Westlake, Texas.

11. Defendant GKN Aerospace US Holdings LLC is the domestic "holding" entity for GKN Aerospace's United States operations. By and through it and the other intermediate Defendants, Melrose directs the management, capital allocation, and safety and environmental-compliance functions of GKN Transparency.

12. Defendant GKN Aerospace Services Limited is a foreign "private limited company" under the laws of England and Wales with its principal place of business located at 11th Floor, The Colmore Building, Colmore Circus Queensway, Birmingham B4 6AT, United Kingdom.

13. Defendant GKN Aerospace Services Limited is owned directly and entirely by Defendant Melrose Industries plc, is the principal operating and holding company within GKN Aerospace's global business (directly in the chain of ownership and control beneath Melrose Industries plc and above the other Defendants), and maintains the GKN Aerospace brand and the GKN Aerospace website. By and through it and the other intermediate Defendants, Melrose directs the management, capital allocation, and safety and environmental-compliance functions of GKN Transparency.

14. Defendant Melrose Industries plc is a foreign business organization organized as a "public limited company" under the laws of England and Wales with its principal place of business located at 11th Floor, The Colmore Building, Colmore Circus Queensway, Birmingham B4 6AT, United Kingdom.

15. Defendant Melrose Industries plc is the ultimate parent entity of what it variously refers to as "GKN Aerospace," "the Group," and "the Company." It owns, directly or indirectly, 100% of the equity interests in each of the other Defendants. By and through the intermediate Defendants, Melrose directs the management, capital allocation, and safety and environmental-compliance functions of GKN Transparency.

3

**CLASS ACTION COMPLAINT AND JURY DEMAND**

16. At all times herein mentioned, each of the Defendants was the agent, servant, employee, joint venturer, partner and/or alter ego of each of the remaining Defendants named herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, joint venture, partnership and/or alter ego. Each Defendant has rendered substantial assistance and encouragement to the other Defendants, acting in concert knowing that its conduct was wrongful and/or unlawful, and each Defendants has ratified and approved the acts of each of the remaining Defendants.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), also known as the Class Action Fairness Act (CAFA). The parties are diverse in citizenship, there are 100 or more Class Members, and the amount in controversy is greater than five million dollars ($5,000,000), exclusive of interest and costs.

18. This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in California, Defendants purposely direct their activities toward California, Defendants purposely avail themselves of the privilege of conducting activities in California, and this action arises out of Defendants' acts in California, where a significant portion of the acts alleged herein occurred.

19. By and through each of the other Defendants, Defendant Melrose Industries plc. directed and controlled the activities of Defendants' Garden Grove, California facility.

20. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to this action occurred in this District. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(1) and (3) because at least one Defendant is subject to general personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### I. Defendants' Business Structure

21. In 2018, Defendant Melrose Industries plc ("Melrose") acquired the businesses formerly operating under the GKN umbrella through an 8.1 UK pound hostile takeover.

**CLASS ACTION COMPLAINT AND JURY DEMAND**

COULSON P.C.

22.     Prior to the takeover, the GKN umbrella included (1) aerospace and (2) automotive and powder metallurgy operations. In 2023, Melrose spun the latter operations off into a company called Dowlais Group plc, such that the GKN Aerospace operations became, and remain, Melrose's sole business.

23.     Melrose describes itself as "a focused aerospace and defence technology business focused on long-term value creation[,]" though its defense operations are specifically within the aerospace industry.

24.     Notwithstanding its chosen specialty, Melrose is, in simple terms, a private equity enterprise. It purchases businesses in order to streamline operations, improve financial metrics, and sell them for a profit after a holding period of only a few years.  It has described this strategy itself as "buy, improve, sell."

25.     When Melrose acquired the GKN holdings, it sought to fulfill this mission by streamlining operational control at the very top level of the company. Consequently, it operated and continues to operate as a single business, despite being nominally partitioned across subsidiaries.

26.     Melrose's UK-based public reporting confirms the cohesiveness of its business structure. Key functions and decision-making, including those most relevant to this case, are performed at the top (Melrose) level.

27.     Melrose reports to UK authorities that "[t]he Group operates cash management controls, including cash pooling  across the Group and the maintenance of revolving credit facilities…to mitigate the risk of any liquidity issues."

28.     Melrose also exercises discretionary control over the funds nominally held by and/or belonging to its "subsidiaries" to allocate them across the business and provide overall financial flexibility.

29.     Defendants refer to the collective of their businesses as GKN Aerospace ("GKN"), the "Group," and/or the organization.

30.     While specific local facilities are nominally controlled by "subsidiaries," as with GKN Aerospace Transparency Systems Inc. and the Garden Grove facility, Melrose organizes

**CLASS ACTION COMPLAINT AND JURY DEMAND**

itself not according to separate business entities, but "business lines" which relate to the company's primary product categories.

31.     Each of Melrose's "business lines," extends across various purportedly separate entities, but is managed by a single "business line president" who reports directly to Melrose's board.

32.     Like its other site-level holdings, Melrose treats Defendant GKN Aerospace Transparency Systems Inc. ("GKN Transparency") not as a separate business, but as a "site" within one of its "business lines."

33.     Beyond directing their activities through its business line presidents, Melrose imposes uniform policies and procedures across each of its nominally separate "subsidiaries" through, among other things, its CEO's imposition of "our lean operating model, 'Brilliant Basics,' which is creating a strong culture of continuous improvement throughout the Group."

34.     Melrose's operational efforts are concentrated at the top level, where it controls all Defendants' operations including with respect to "Health, Safety, and Environmental" ("HSE") functions, regarding which it claims:

a.     "[t]he health, safety, and wellbeing of our people remain a central priority, supported by Group wide safety programmes[.]"

b.     "the Group has a dedicated health and safety team which has rolled out a comprehensive health and safety programme across all sites."

c.     that "[w]e have a comprehensive health and safety programme across all sites, which is underpinned by our Golden Safety Rules."

d.     that it recently conducted "a top-down assessment to identify the physical risks associated with our operational sites[]" in which it stated its purported commitment to "ensure that our sites do not adversely affect the integrity of a geographic area, local communities or change its ecological features and functions[.]"

e.     that its "governance framework" operates "through an integrated Melrose and GKN Aerospace sustainability function. This cross-functional and multi-

6

**CLASS ACTION COMPLAINT AND JURY DEMAND**

disciplinary team is responsible for executing the Board's overall sustainability strategy."

f.      that "[h]ealth and safety management systems are supported by internal health and safety effectiveness audits, with regular oversight and challenge by the Melrose senior management team, quarterly reporting to the Board, and further regular oversight over any material incidents or issues that arise."

g.      that it "understand[s] the unique challenges and responsibilities that come with our industry, and we are resolute in our commitment to maintaining the highest standards in these areas. In the past year, we have continued to make significant strides in ensuring the safety of our workforce and the safety of our operations."

h.      to set a "Group-wide safety target [of] a Total Injury Rate of 3.0 per 1,000" full time workers by the end of 2030.

i.      to enforce, at the top level, "the highest safety standards across all areas of our business." It purports to maintain "strong govermance principles, clear policies and consistent controls across the Group."

j.      to have "commitment to ensuring the highest safety standards across all areas of our business" and make substantial efforts to "strengthen our control and oversight of safety performance." It sets top-level targets it seeks to meet by "strengthening how we measure, monitor and manage safety risks and drive consistent performance."

k.      "[o]ur Group safety management system operates across the business with local health and safety systems subject to regular audits and oversight by the senior management team." It claims that "Site controls are verified through internal audits, leadership safety tours and follow-up action plans, while incidents are investigated by business line directors, escalated as appropriate and dressed through corrective actions." And "good practices are shared across the organisation."

l.      that through its Group-wide efforts, "we seek not only to achieve compliance but to enhance… safety outcomes and environmental efficiency."

**CLASS ACTION COMPLAINT AND JURY DEMAND**

COULSON  P.C.

35. Similarly, Melrose specifically directs and controls the financial and other business aspects of the Group at the top level. In its own words:

a. "The main responsibilities of the [Melrose] Board" across the Group include to "ensure that adequate funding and personnel are in place," "oversee and assess the Group's risk management and internal control systems, and review their effectiveness," "consider… requests for major capital expenditure," and to "challenge, review, and exercise robust managerial oversight across key decisions, actions and processes within the Group[.]"

b. "The Melrose Executive Committee operates under the direction of the Chief Executive Officer… and comprises members of the Melrose head office team, including the executive Directors. Its key roles are to ensure that there is full knowledge of, and coordination between, the Melrose corporate team and the GKN Aerospace business lines, including in respect to the Group's key transformation projects, as well as day-to-day management, to ensure that the appropriate resource is being devoted to resolve any issues, and to ensure that actions being taken are supportive of the Group's aims, objectives, and culture."

c. Melrose recently reported that it has made "[s]ubstantial progress… in completing restructuring and portfolio initiatives, implementation of civil and defence cost reductions, and execution of key site level improvements, with remaining activities continuing to progress."

d. Evaluating the Group's cash position in the aggregate, Melrose states that "[t]he combination of [] cash and the available headroom on the Banking Facilities allows the Directors to consider that the Group has sufficient access to liquidity for its current needs."

e. The Melrose board elects not to disclose "intercompany balances and transactions… with "fully owned subsidiary undertakings."

36. At all relevant times, such a unity of interest and ownership existed among Defendants that the separate personalities of GKN Transparency, on the one hand, and the parent

8

**CLASS ACTION COMPLAINT AND JURY DEMAND**

and holding-company Defendants—Melrose, GKN Aerospace Services Limited, GKN Aerospace US Holdings LLC, GKN Aerospace North America Inc., and GKN Aerospace, Inc.—on the other, do not in reality exist. GKN Transparency is, and at all relevant times was, a mere instrumentality, conduit, agent, and alter ego through which the parent and holding-company Defendants conducted the Garden Grove operations as a single, integrated enterprise.

37.    This unity of interest and ownership is reflected in, among other things, the following:

a.    Melrose owns, directly or indirectly, one hundred percent of the equity of GKN Transparency and of each intervening Defendant, and holds and exercises the power to control their operations, finances, personnel, and policies;

b.    Defendants do not hold GKN Transparency out as, or operate it as, an independent business, but instead present themselves to customers, regulators, and the public as a single enterprise variously called "GKN Aerospace," "the Group," and "the Company," and organize their operations not according to separate corporate entities but according to centrally managed "business lines," each directed by a "business line president" reporting directly to Melrose's board;

c.    the corporate functions most relevant to this action—including health, safety, and environmental policy, auditing, and oversight—are not performed at the GKN Transparency level but are centralized at the Melrose level, where Melrose maintains Group-wide safety programs and standards, conducts internal safety-effectiveness audits of its sites, requires quarterly safety reporting to the Melrose Board, and vests in its own senior management the highest management responsibility accountable for health and safety across all sites, including the Garden Grove facility;

d.    Melrose likewise centralizes financial control over the enterprise, operating Group-wide cash-management and "cash pooling" arrangements, exercising discretionary control over funds nominally held by its subsidiaries, considering and directing requests for major capital expenditure, reporting the enterprise's results and liquidity on a consolidated Group basis rather than by entity, and declining to disclose

9

**CLASS ACTION COMPLAINT AND JURY DEMAND**

intercompany balances and transactions with its "fully owned subsidiary undertakings";

e. Melrose imposes uniform policies, procedures, and operating models—including its "Brilliant Basics" operating model—across each nominally separate subsidiary, and coordinates its corporate team and the operating business lines through a single Melrose Executive Committee operating under the direction of Melrose's Chief Executive Officer;

f. on information and belief, GKN Transparency was at all relevant times inadequately capitalized to satisfy the foreseeable liabilities arising from the bulk storage of tens of thousands of gallons of hazardous and volatile chemicals adjacent to a densely populated residential area, because the assets and revenues of the enterprise were retained, swept, and controlled at the parent and holding-company level rather than maintained at the operating-subsidiary level; and

g. on information and belief, Defendants observe the forms of corporate separateness selectively and as a matter of convenience while, in the actual conduct of the Garden Grove operations, disregarding those forms.

38.     Adherence to the fiction of separate corporate existence among Defendants under these circumstances would sanction injustice and produce an inequitable result. The parent and holding-company Defendants directed, controlled, profited from, and retained ultimate responsibility for the safety of the Garden Grove operations and for the conditions that caused the emergency alleged herein, yet would confine liability to an operating subsidiary that likely does not independently hold the assets to answer for the harm they caused. Permitting Defendants to enjoy the benefits of operating as a single integrated enterprise while evading the corresponding responsibilities of that enterprise would leave Plaintiff and the Class without an adequate remedy. Each Defendant is therefore liable for the acts and omissions of each other Defendant as alleged herein.

10

**CLASS ACTION COMPLAINT AND JURY DEMAND**

**II.   Defendants' Garden Grove, California Operations**

39.     Defendants, but nominally GKN Aerospace Transparency Systems, Inc., own and operate an industrial facility located at 12122 Western Avenue, Garden Grove, CA 92841.

40.     GKN Aerospace Services Limited maintains the GKN Aerospace website ("Defendants' Website"), which states that "GKN Aerospace is a leading global tier one supplier of airframe and engine structures, landing gear, electrical interconnection systems, transparencies, and aftermarket services."[1]

41.     According to Defendants, "GKN Aerospace's site at Garden Grove is the world's leading provider of military transparency systems and commercial aircraft transparencies."[2]

42.     "Transparencies," in the aerospace context, refers to "transparent aircraft parts like windshields or windscreens, canopies, windows, and blast shields."[3]

43.     Defendants claim that "[t]he [Garden Grove] site offers a full range of capabilities for design, analysis, testing and certification of military canopies, cockpit windows and passenger windows. GKN Aerospace manufactures the world-leading F-35 canopy from its Garden Grove facility, as well as transparencies for the Boeing 787 Dreamliner and 737, the Airbus A350, HondaJet and Bombardier C-Series."

44.     Aircraft transparencies are most commonly constructed out of polycarbonate, polymethyl methacrylate ("PMMA") acrylic-type plastics, advanced composite plastics, and/or glass.[4]

45.     PMMA is also known as acrylic or acrylic glass, and is sold under various tradenames including Plexiglas, Acrylite, Lucite, and Perspex.

46.     PMMA is a "synthetic polymer," which means it is a manmade material created by chemically linking thousands of small molecules (monomers) into lengthy repeating chains.

---

[1] https://www.gknaerospace.com/about-us/ (last visited May 29, 2026).
[2] https://www.gknaerospace.com/locations/americas/usa/?office=gardengrovecalifornia (last visited May 29, 2026).
[3] *See* https://dsiac.dtic.mil/technical-inquiries/notable/aircraft-transparency-construction-materials-and-applications/ (last visited May 29, 2026)
[4] *See id.*

11

**CLASS ACTION COMPLAINT AND JURY DEMAND**

47.    More specifically, PMMA is a "transparent thermoplastic," a plastic polymer material that becomes pliable or moldable when exposed to elevated temperatures and then solidifies upon cooling.

48.    PMMA is derived (and made) from methyl methacrylate ("MMA"), which is a colorless organic compound that can be created from various chemical precursors.

49.    Approximately 75% of all MMA is used to create PMMA plastics through the process of exothermic (heat-releasing) polymerization.

50.    MMA is acutely toxic, and is known to cause eye, skin, and respiratory inflammation, irritation, and/or pain in humans and/or other mammals.

51.    MMA is also extremely combustible.

52.    While the business of Defendants' Garden Grove operation was until recently unfamiliar to most people, it is straightforward. Defendants take bulk (primarily chemical) materials and convert them into windows, windshields, and canopies to be installed on aircraft.

53.    Therefore, the transportation, storage, handling, and use of these constituent chemicals is a central part of, not incidental to, Defendants' business.

54.    As reflected in their public filings, Defendants are acutely aware of the risks inherent in their "chemical use," and they admit in this regard that "[f]ailure to adequately protect our employees from harm could have a major impact on employees as well as their families, colleagues, and communities. Such a failure could also result in legal claims, reputational damage, and financial loss."

55.    Defendants' Garden Grove facility sits on 15.5 acres in close proximity to densely populated residential neighborhoods.

56.    The site employs over 500 workers.

57.    The site's proximity to thousands of people makes it particularly important that Defendants take all necessary precautions to ensure that the hazardous chemicals at the center of their business are safely transported, stored, handled, and used. A failure to do otherwise would predictably endanger an almost unthinkable number of human lives and thousands of homes.

12

**CLASS ACTION COMPLAINT AND JURY DEMAND**

58.    Because of its volatility, MMA must be stored in purpose-built containers. Tanks at similar facilities must generally be equipped with a sufficient combination of precautionary devices, such as cooling mechanisms, relief valve(s), and intake valves for injection of stabilizing chemicals.

59.    Such tanks must also be equipped with sufficient redundancy in their precautionary devices, so that a foreseeable inoperability in the primary devices does not lead to a catastrophic outcome.

60.    The standard MMA storage configuration recommended by manufacturer BASF (and the prior Rohm & Haas / Dow / Röhm) Safety Data Sheets, call for: (a) a maximum bulk storage temperature of 25°C / 77°F, with two independent high-temperature alarms triggering at 35°C and 45°C; (b) minimum 10% gas-headspace volume above the liquid; (c) active oxygen sparging or atmospheric breathing to maintain 5–21% oxygen in the headspace (BASF: "Never use tanks with inert-gas installation for storage"); and (d) an installed re-stabilization (inhibitor injection) system designed to actuate at 45°C bulk temperature.

61.    Defendants' facility stores MMA in at least two of three large tanks located adjacent to one another in a single tank-farm area, known as Tank 1, Tank 2, and Tank 4.

62.    Tank 1, the subject of the chemical emergency, is a 34,000 gallon rated capacity vessel that, at the time of the May 21 incident held approximately 6,000-7,000 gallons of liquid MMA monomer, meaning that the tank was at roughly 20% utilization, and contained a large "headspace."

63.    Remarkably, it was reported that while Tank 2 and Tank 4 were threatened by the emergency in Tank 1, the contents of at least one of them could not be promptly identified through Defendants' records.

### III.    Industry Awareness of the Risk of Thermal Runaway Events

64.    MMA is particularly volatile because of its tendency to self-polymerize, which happens when the chemical begins to react with itself. This reaction generates heat and pressure, which can cause the liquid to vaporize, and when unimpeded is referred to as a "runaway." These

13

**CLASS ACTION COMPLAINT AND JURY DEMAND**

vapors can then ignite or explode, in what is called a "boiling liquid expanding vapor explosion" or "BLEVE."

65. Storage "runaway" events typically involve the absence and/or failures of several necessary storage mechanisms.

66. First, because of MMA's risk for self-polymerization, it is usually shipped and stored with a chemical polymerization inhibitor, that neutralizes unstable molecules and requires dissolved oxygen to regenerate. These inhibitors are depleted slowly under proper storage conditions, rapidly under elevated temperature, and essentially instantaneously if dissolved oxygen is removed through any mechanism.

67. After the polymerization inhibitor falls below a critical threshold, contact with a number of common contaminants can cause the MMA to begin polymerization. These contaminants include rust and other oxidation products from carbon-steel tank shells; trace peroxide that form spontaneously in MMA during prolonged storage; heat-transfer fluids, strong acids or bases, and UV light.

68. The risks posed by contaminants mean that tanks must be constructed from appropriate materials and thoroughly inspected on frequent intervals.

69. As polymer concentration builds up, the bulk liquid viscosity rises (the material thickens), which severely hinders chain-termination reactions, while propagation reactions remain unimpeded, causing the polymerization to enter a phase of auto-acceleration.

70. The net reaction rate accelerates even as the temperature is held constant — the rate doubles for roughly every $10°C$ ($18°F$) rise in bulk temperature. This reaction is called *gel effect* and was first described for MMA in 1948.

71. In a tank holding 7,000 gallons of MMA, once gel effect engages, chemistry alone will likely be insufficient to head it off.

72. As MMA solidifies, it produces heat, furthering the chain reaction, and creating the risk of exponential acceleration.

73. Exothermic heat release from the polymerization process raises the bulk temperature within the tank. While the cooling capacity of the tank scales *linearly* with

14

**CLASS ACTION COMPLAINT AND JURY DEMAND**

temperature differential, the heat-generation rate scales *exponentially*. Because of this discrepancy, the cooling line is then exceeded and MMA's boiling point (101°C / 214°F) is approached, as tank pressure rises sharply both from vapor pressure and from gas-phase reaction byproducts. At this point, it is essential that a properly maintained and functioning relief valve be in place to release pressure within the tank.

74. Finally, when the polymerizing MMA is in its viscous pre-solidification phase, the compound can migrate into the relief and injection valve seats and stems as the internal pressure of the storage tank continues to rise, causing "valve fouling." The polymer then seals the valving, rendering pressure relief and inhibitor injection impossible. Thus, it is well known that if a tank's final failsafe is a single relief valve, it may not be enough to mitigate the effects of complete polymerization.

75. It is therefore well known that absent sufficient and redundant control mechanisms, a tank containing MMA poses the risk of rupturing under pressure and exploding, which would in turn send a toxic chemical plume into the air surrounding the tank and/or leak MMA onto the ground.

76. Once initiated, the polymerization process in a tank holding as much MMA as the failed tank at Garden Grove could release as much thermal energy over the course of minutes-to-hours as detonating 3.2 metric tons of TNT.

77. There is a substantial history of incidents of thermal runaway and other events caused by polymerization of MMA and/or similar materials, which is precisely the reason why MMA storage has long been the subject of regulatory and supplier warnings to ensure safe storage.

78. On July 2, 2008, there was a similar incident at the Rohm & Haas (now Dow) facility in Louisville, KY. There, plant personnel identified a rail tank car containing about 21,000 gallons of MMA exhibiting signs of polymerization. The tank car was venting MMA vapor at concentrations up to 700 organic vapor units and 25% of the lower explosive limit (LEL) at the vent. A unified command of EPA, the Lake Dreamland Fire Department, the Kentucky State Fire Marshal, and Rohm & Haas applied water cooling to the tank car shell to decrease vapor concentrations to a safe level. Critically, the tank car was specifically engineered to a chemical-

**CLASS ACTION COMPLAINT AND JURY DEMAND**

manufacturer specification to survive a complete polymerization event, without venting, accommodating both pressure and temperature buildup from a full inhibitor loss.

79. In another incident, described in the UK Health & Safety Executive's (HSE) 204 Safety Alert *Fire and Explosion Risk — Reactive Monomers* (HSE Manufacturing Sector, CI 4), a single drum of inhibited MMA was returned to a chemical transport company and stored unmonitored, after which it exploded, resulting in significant property damage and forcing closure of a nearby motorway. HSE attributed the event to the absence of a sufficient polymerization inhibitor after the inhibitor degraded over time, explaining that "[h]igh summer temperatures can cause poorly inhibited monomer to runaway or self-react."

80. There have also been well documented and destructive polymerization incidents related to similar polymers. For example, on May 7, 2020, a styrene storage tank at the LG Polymers India plant released a toxic vapor cloud after a runaway polymerization caused by failure of the refrigeration system maintaining bulk styrene below 20°C. The incident resulted in 12-13 deaths.

81. Similarly, on May 18, 2001, the Fu-Kao Chemical Plant in northern Taiwan suffered a runaway polymerization that resulted in a vapor cloud explosion, killing one person and injuring 112 others.

82. The HSE documented a similar incident in 1992, where an uncontrolled runaway polymerization occurred at a plant that made a maleic co-polymer product.

83. Because of the risk of polymerization and thermal runaway inherent in MMA storage, chemical suppliers like Röhm GmbH, and Mitsubishi Chemical (Lucite International), and BASF have published supplier warnings that travel with every shipment of MMA and define the industry-standard duty of care for storage. For example, BASF's October 2025 Safety Data Sheet for MMA states explicitly: "Risk of violent self-polymerization if overheated in a container"; "Risk of hazardous polymerization under certain conditions (e.g. elevated temperatures, low inhibitor and oxygen concentration)."; "The stabilizer is only effective in the presence of oxygen. Maintain contact with atmosphere containing 5 – 21% oxygen. Never use tanks with inert-gas installation for storage"; "In case of bulk storage, the storage-tanks should at least be equipped

**CLASS ACTION COMPLAINT AND JURY DEMAND**

with two high temperature … [alarms]"; and "In case of a fire in the vicinity a restabilization system should be used if the temperature in the bulk storage-tank reaches 45°C. Evacuate area of all unnecessary personnel."

84.     Studies have found that nearly 15% of U.S. uncontrolled chemical reaction incidents were thermal runaway events involving rapid polymerization.

**IV.     The Polymerization Event at Defendants' Garden Grove Facility**

**Thursday, May 21, 2026**

85.     On the afternoon of Thursday, May 21, 2026, a valve in the tank's refrigeration system failed, causing the contents to begin to overheat and pressurize.

86.     As the temperature rose, the inhibitor and dissolved oxygen began to deplete, and polymerization initiated inside the tank.

87.     The tank's pressure relief valve and sprinkler system activated automatically.

88.     At 3:22 p.m., The Orange County Fire Authority (OCFA) was alerted to a hazardous materials incident at the facility.

89.     Local media outlets reported the initial toxic-leak call time as approximately 3:30 p.m. OCFA Captain Sean Doran later confirmed: "We arrived to a 34,000-gallon tank containing an industrial chemical that had been overheated inside the vessel."

90.     Late in the afternoon, authorities issued the initial evacuation orders for the buildings from Western Avenue to Beach Boulevard, and from Garden Grove Boulevard to Orangewood Avenue; plus the area along Lampson Avenue from Santa Rosalia Avenue to Western Avenue.

91.     OCFA began applying cooling operations to the tank throughout the evening, using water hoses and an automated sprinkler system to try to suppress the tank's temperature.

92.     At approximately 8:40 p.m., OCFA lifted the initial evacuation orders. Officials reported that crews had spent hours cooling the tank and reducing vapor production, and the tank appeared more stable. Residents and businesses in the initial affected area were allowed to return, though street closures remained in effect.

17

**CLASS ACTION COMPLAINT AND JURY DEMAND**

93. Unfortunately, conditions inside the tank continued to deteriorate overnight. OCFA later stated: "[y]esterday's cooling operation was successful, and the facility and industrial crews initially made progress toward product removal. However, an inoperable valve on the tank has created additional operational challenges, preventing complete mitigation at this time."

**Friday, May 22, 2026**

94. At 6:30 a.m. on May 22, OCFA reissued mandatory evacuation orders "due to changing conditions" as hazmat crews continued attempting mitigation.

95. Orange County Sheriff's deputies go door-to-door to notify and assist residents subject to the evacuation orders.

96. The evacuation zone was expanded to encompass approximately 50,000 residents across an approximately 9-square-mile area in six cities: Garden Grove, Cypress, Stanton, Anaheim, Buena Park, and Westminster. This area, the "Evacuation Zone" was bounded as follows: north of Trask Avenue, south of Ball Road, east of Valley View Street, west of Dale Street.

97. That morning, at least 25 local schools closed. Multiple Garden Grove Unified School District campuses closed. Affected students were initially relocated (e.g., Esther L. Walter School students to Jonas E. Salk; Robert M. Pyles STEM Academy to Mattie Lou Maxwell Elementary). Multiple public facilities — including schools, hospitals, nursing homes, fire and law enforcement stations — were within the evacuation zone.

98. The same morning, OCFA Division Chief Craig Covey issued a dire warning at a press conference: "This is not precautionary . . . this thing is gonna fail, and we don't know when."

99. Chief Covey described two possible outcomes, neither one good. Either the tank would crack, spilling between 6,000 and 7,000 gallons of MMA, or it would enter thermal runaway and explode causing untold harm.

100. At this time, the OCFA noted that the tank's exterior valves were "gummed up," strongly suggesting that there was already polymer formation on internal valve components. This discovery meant that opening the valve to release pressure in the tank was no longer an option; it was too late.

18

**CLASS ACTION COMPLAINT AND JURY DEMAND**

101.    Fortunately, Chief Covey's predictions would not come to pass, but it was only due to the heroic efforts of his department and other first responders, as well as some incredible good luck.

102.    The same day, Orange County District Attorney Todd Spitzer's office began surveying the facility using drones, later confirming that it had launched a criminal investigation.

103.    At a 2:00 p.m. press conference at the Los Alamitos racetrack in Cypress, OCFA Interim Fire Chief T.J. McGovern and Division Chief Covey provided updates. Efforts to stabilize the tank remained unsuccessful, and the damaged tank valves were preventing crews from safely accessing the material inside.

104.    On the evening of May 22, a series of emergency shelters began to open for displaced residents, many of whom were unable to locate vacant hotel rooms. Among these shelters were Freedom Hall (Fountain Valley); Los Amigos High School (Fountain Valley); Oceanview High School (Huntington Beach, opened 1:30 a.m. May 22 by OCFA as a "congregate dormitory shelter"); John F. Kennedy High School (La Palma); Elks Lodge (Garden Grove). Most of the shelters would reach capacity over the weekend.

105.    On the evening of May 22, Defendants finally issued a public statement, noting that "[w]e are currently responding to a situation at our Garden Grove site." They claimed that "[o]ur priority remains the safe resolution of this incident, so that residents can return to their homes as quickly as possible."

**Saturday, May 23, 2026**

106.    Throughout the day of May 23, the tank's internal temperature continued to rise at an average rate of approximately 1 degree per hour.

107.    The temperature rose from approximately 77 degrees to  approximately 90 degrees over the day; it would ultimately reach approximately 100 degrees.

108.    Early in the afternoon, California Governor Newsom proclaimed a state of emergency in Orange County. The proclamation directed the Governor's Office of Emergency Services and all state agencies to support the county and impacted local jurisdictions, unlocked

**CLASS ACTION COMPLAINT AND JURY DEMAND**

COULSON P.C.

additional emergency response resources, and authorized the use of state-owned properties and fairgrounds as shelters for displaced residents.

109. The same afternoon, Orange County District Attorney Todd Spitzer publicly announced a criminal investigation into GKN Aerospace, stating: "[f]or goodness' sake, they're in the middle of a commercial area, residential, it's an urban population. . . . It's irresponsible, it's horrific, and I'm angry about it."

110. DA Spitzer expressed frustration at Defendants' ongoing lack of responsiveness. "Tonight, we are not getting satisfactory answers." His office established an anonymous tip line, online form, and email, appealing to GKN employees to come forward with information about the event.

111. Throughout Saturday, May 23, emergency crews continued 24-hour cooling operations, with OCFA again stating that efforts "to depressurize the storage tank" had failed because of the inoperable valve and the tank had "appeared more stable" only superficially.

**Sunday, May 24, 2026**

112. Throughout May 24, hazmat teams continued their cooling operations. It was reported that some 800 personnel from state and local emergency crews were engaged in the response. Crews use ground sensors and drone overflights with infrared imaging to monitor the tank's external temperature.

113. From late afternoon into the evening of May 24, crews succeeded in stabilizing and/or securing tanks 2 and 4. One had neutralizing agents successfully injected; the other was stable. Only the failing tank with the jammed valve remained at imminent risk.

114. From the evening of the 24th overnight, May 24–25 OCFA hazmat specialists used cooler nighttime temperatures to mitigate the risk of a risky close-range overnight inspection. Firefighters climbed on top of the tank and removed the insulation (or "shroud") surrounding the tank to enable more effective direct cooling.

115. Infrared drone imaging during this operation provided the first evidence of a source of hope: a potential crack developing in the tank's bulging steel shell.

20

**CLASS ACTION COMPLAINT AND JURY DEMAND**

**Monday, May 25, 2026**

116. In the early morning of May 25, OCFA confirmed that a physical crack had developed in the tank's shell. The crack was determined to be relieving some of the internal pressure, which had been building since May 21.

117. Across May 25, it was also revealed that the tank temperature was stabilizing and began to decrease, dropping approximately seven degrees.

118. In view of these developments, at approximately 10:43 a.m., Interim Fire Chief T.J. McGovern and Incident Commander Chief Covey confirmed that the threat of a BLEVE had been eliminated.

119. While the threat was far from over, this meant that the worst-case scenario had been avoided. The elimination of a potential BLEVE reduced the potential harm and damage significantly.

120. Early on May 25, in connection with efforts from various local, state, and federal officials including Rep. Derek Tran, both of California's senators, and Orange County supervisor Nguyen, Governor Newsom submitted a request for a federal Emergency Declaration.

121. President Trump signed the request the same day. The Emergency Declaration designated the incident the "Western Incident." It authorized FEMA to provide direct federal assistance and made residents potentially eligible for federal disaster assistance.

122. Late on May 25, the evacuation zone was reduced from its prior size, allowing roughly 34,000 of the 50,000 evacuated residents to return home. The remaining evacuation zone was bounded by Orangewood Avenue to the north, Dale Street to the east, Knott Street to the west, Garden Grove Boulevard to the south.

**Tuesday, May 26, 2026**

123. As of the morning of May 26, the tank's internal temperature had stabilized at approximately 92 degrees. OCFA Captain Greg Barta stated that "[o]ur efforts today are also focused on the same, continuing to neutralize the adjacent tanks and monitor that temperature and ensure it holds at 92 degrees."

21

**CLASS ACTION COMPLAINT AND JURY DEMAND**

124. During the day, crews began scaling back water flow to determine whether the tank has stabilized on its own.

125. On May 26, Defendant Melrose Industries plc issued a disclosure through the London Stock Exchange Regulatory News Service regarding the incident, acknowledging "one of its industrial sites in the U.S. has suffered a chemical accident," signaling potential operational disruptions for customers.

126. A community meeting was held the evening of May 26, where Garden Grove residents demanded accountability and the permanent closure of the GKN facility.

127. At the meeting, Garden Grove Mayor Stephanie Klopfenstein echoed the community's concerns, stating "[t]here must be accountability. GKN must be held accountable."

128. The evening of May 26, authorities announced they were lifting the final evacuation orders after the tank temperature remained stable for four hours without intervention from sprinklers.

129. At approximately 8:15 p.m., OCFA officially lifted all remaining evacuation orders. Unified Command (OCFA + Law Enforcement + EPA + OC Health Care Agency) confirmed that there was now "no active chemical leak, no threat of explosion, no threat of fire and no risk to the public."

130. Adding to residents' plight, a May 26 announcement by Garden Grove Police reported seven arrests had occurred in the Evacuation Zone during the incident, including at least one for looting. Sgt. Nick Jensen advised residents returning home: "If you come home and find your door open, call the police department. Do not enter the house."

**Wednesday, May 27, 2026**

131. The evening of May 27, GKN issued its second public statement, signed by Senior Vice President Steve Carlin: "On behalf of the team at GKN Aerospace, I want to say how sorry we are for the uncertainty and disruption this situation has caused. I recognize how challenging this has been, particularly over the Memorial Day holiday. We are committed to understanding what occurred and identifying ways we can support those affected." He continued that "[w]e recognize there is more work ahead."

22

**CLASS ACTION COMPLAINT AND JURY DEMAND**

132.    The regulatory and legislative processes began to move. Governor Newsom indicated that California would begin reviewing GKN's safety records and the safety records of other chemical plants across California. State Senator Tom Umberg reportedly stated "[t]here will be legislation."

**Thursday, May 28, 2026**

133.    On May 28, the City of Garden Grove launched a business impact survey "seeking input from businesses affected by the recent chemical emergency and evacuation orders related to the methyl methacrylate (MMA) tank incident."

134.    The EPA continued performing air monitoring in the area, reporting that measurements remained within "normal limits" throughout the emergency.

**Plaintiff's Experience**

135.    Plaintiff Wael Amin resides in a home on Park Plaza in Stanton, California, less than one mile from Defendants' Garden Grove facility.

136.    Shortly after awakening at 6:00 a.m. on the morning of Friday, May 22, 2026, Plaintiff's phone alerted him that he was subject to mandatory evacuation orders.

137.    Plaintiff promptly woke his wife and one-year-old son, got them to his vehicle, and fled the area.

138.    Plaintiff was unable to locate space at a shelter that could accommodate his family, particularly in view of their religious observation of preserving separation between the sexes in certain contexts.

139.    Plaintiff looked for vacancy at hotels, but the hotels were alternatively fully occupied or prohibitively expensive as an unanticipated expense for Plaintiff.

140.    Plaintiff and his family therefore resorted to sleeping in Plaintiff's car, which doubles as his source of income; Plaintiff is a rideshare driver.

141.    Plaintiff was unable to work during the evacuation, suffering lost income.

142.    Plaintiff was required to incur emergency expenses for basic necessities such as food away from home during the pendency of the evacuation.

**CLASS ACTION COMPLAINT AND JURY DEMAND**

143. The losses Plaintiff incurred as a result of the evacuation were a significant financial hardship against the backdrop of already difficult economic and financial conditions.

144. Plaintiff's home was located in the area of the Evacuation Zone that was the last to have the evacuation orders lifted, so he was unable to return home before late in the evening of May 26, 2026.

## CLASS ALLEGATIONS

145. Plaintiff brings this action individually and on behalf of all persons similarly situated. Plaintiff seeks to represent a Class preliminarily defined as: all persons who resided (including owner-occupants, renters, lodgers, and their resident family members) at residential property within the Evacuation Zone, at any point in time between May 21 and 26, 2026.

146. The Evacuation Zone consists of the area bounded as follows: north of Trask Avenue, south of Ball Road, east of Valley View Street, west of Dale Street.

147. The Class and its members are collectively referred to as the "Class" or "Class Members."

148. Excluded from the Class are Defendants, their officers, directors, employees, affiliates, legal representatives, successors, and assigns, as well as any judicial officer presiding over the matter and their immediate family members and staff.

149. Plaintiff reserves the right to amend or modify the Class definition, and/or to add one or more subclasses, after having had an opportunity to conduct discovery and further investigation.

**Numerosity**

150. The members of the Class are so numerous that joinder of all Class Members in a single proceeding is impracticable. The Class encompasses approximately 50,000 residents from tens of thousands of homes.

**Commonality**

151. Numerous common questions of law and fact are common to Plaintiff and the Class and predominate over any questions affecting individual Class Members. Such common legal and factual questions are numerous and include, but are not limited to:

24

**CLASS ACTION COMPLAINT AND JURY DEMAND**

a. The specific duties owed by each Defendant to residents in the vicinity of Defendants' Garden Grove facility;

b. Whether Defendants breached their duties to Plaintiff and the Class, including whether Defendants failed to properly select, construct, maintain, operate, and/or monitor Tank 1 or otherwise safely store, maintain, and/or use MMA;

c. Whether Defendants' failure to properly select, construct, maintain, operate, and/or monitor their MMA storage tank was willful or negligent;

d. Whether a mandatory evacuation of the area in which Plaintiff and the Class reside was a foreseeable consequence of Defendants' conduct;

e. Whether Defendants' breach of duties owed was the actual and proximate cause of harm to Plaintiff and the Class;

f. Whether each Defendants is each legally responsible for the conduct and/or conditions at the Garden Grove facility;

g. Whether the conditions created by Defendants' actions and/or failures substantially interfered with the use of evacuated residents' property;

h. Whether the conditions created by Defendants' actions and/or failures unreasonably interfered with the use of evacuated residents' property;

i. Whether the conditions created by Defendants' actions and/or failures interfered with rights of the general public;

j. Whether Defendants' conduct and/or failures were unfair within the meaning of the UCL;

k. Whether Defendants' conduct and/or failures were unlawful within the meaning of the UCL, and on what basis;

l. Whether storing large-scale quantities of MMA in close proximity to residential neighborhoods can ever be considered safe under proper conditions such that it constitutes ultrahazardous activity;

m. The proper type, measure, and extent of relief to which Plaintiff and the Class are entitled.

**CLASS ACTION COMPLAINT AND JURY DEMAND**

COULSON P.C.

**Typicality**

152.    Plaintiff's claims are typical of the claims of the Class.

153.    Plaintiff has the same interests in this matter as all other members of the Class, and seeks the same relief to which they are entitled under the same legal theories applicable to each of them.

154.    Plaintiff and the Class sustained the same types of damages because of Defendants' common acts and/or failures to act.

**Adequacy of Representation**

155.    Plaintiff will fairly and adequately represent the interests of the Class and ensure its claims are prosecuted with diligence and care.

156.    Plaintiff has no interests antagonistic to those of the Class and is subject to no unique defenses.

157.    Plaintiff has retained counsel who is experienced in complex class action litigation, specifically dozens of industrial environmental class actions, including those involving mandatory evacuations. Plaintiff's counsel will vigorously prosecute this action and otherwise protect and fairly and adequately represent Plaintiff and the absent Class Members.

**Rule 23(b)(3) Certification- Predominance and Superiority**

158.    Plaintiff seeks certification of the Class pursuant to Fed. R. Civ. P. 23(b)(3).

159.    The common issues, as described herein, predominate over any minimal individual issues that may exist as between members of the Class.

160.    A class action is superior to all other methods for fair and efficient adjudication of this controversy for at least the following reasons:

a.    Prosecution of individual actions is economically impracticable for individual Class Members in light of the substantial costs inherent in this sort of litigation;

b.    Absent class-wide relief, Defendants are likely to persist in the categories of harmful conduct alleged herein and continue to derive benefits from such conduct;

c.    Prosecution as a class action will eliminate the risk of repetitious litigation and/or promote uniformity in adjudication;

26

**CLASS ACTION COMPLAINT AND JURY DEMAND**

d. Individual claims would create a risk of adjudications which would be dispositive of the interests of other individuals, and/or substantially impair or impede their ability to protect and pursue their interests;

e. Plaintiff seeks relief relating to the Defendants' common actions and the equitable relief sought would benefit the Class as a whole;

f. A class action will be efficient and promote economy of time, effort, resources, and expenses; and

g. The proposed class action is manageable.

**Rule 23(b)(2) Certification**

161.     Plaintiff additionally seeks certification of the Class pursuant to Fed. R. Civ. P. 23(b)(2), because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole

**Rule 23(c)(4) Certification in the Alternative**

162.     Alternatively, Plaintiff seeks certification under Fed. R. Civ. P. 23(c)(4), because at a minimum class treatment is appropriate with respect to particular issues.

<u>**CAUSES OF ACTION**</u>

<u>**COUNT I**</u>

**Negligence**

Plaintiff and the Class Against All Defendants

163.     Plaintiff realleges and incorporates by reference each and every allegation in this complaint as if fully set forth herein.

164.     Defendants are the owners, operators, directors, and/or managers of, and entities responsible for, a facility that stored highly hazardous chemicals in close proximity to a densely populated area.

165.      Defendants therefore owed a duty of care to Plaintiff and members of the Class as members of the communities surrounding the facility, to exercise reasonable care in their

27

**CLASS ACTION COMPLAINT AND JURY DEMAND**

operations, and in the storage, maintenance, and use of MMA and other hazardous chemicals, to prevent against the threat, risk, or fact of a dangerous leak, release, or explosion.

166.    Defendants similarly owed a duty of care to enforce and maintain proper safety procedures and safeguards to prevent the threat, risk, or fact of the release of hazardous materials into surrounding residential areas, and to prevent the risk of tank explosion or failure in case of an MMA polymerization event.

167.    Defendants owed a duty of care to Plaintiff and members of the Class to prevent foreseeable harm from befalling the community because of the hazardous chemicals Defendants maintain and store at their facility.

168.    Defendants breached their duties to Plaintiff and the Class through improperly storing, handling, and maintaining MMA, and through their failure to take safety precautions which would have terminated the risk of a thermal runaway event long before an evacuation was necessary.

169.    Defendants improperly stored, handled, and/or maintained MMA, in violation of applicable safety guidelines. This includes, without limitation:

a.    Failing to devote sufficient resources to the operation, maintenance, inspection, and/or supervision of the tank;

b.    failing to properly inspect and/or maintain the tank's refrigeration system;

c.    failing to properly inspect and/or maintain their tank's valves;

d.    failing to maintain necessary and adequate redundancies for cooling the tank, releasing pressure, and/or responding to and/or preventing thermal escalation;

e.    failing to keep the tank free from contaminants;

f.    failing to maintain adequate inhibitors in the tank;

g.    failing to adequately maintain gauges or other instruments that would allow for adequate reading and monitoring of tank conditions;

h.    failing to maintain adequate precautions for limiting the risk involved with the tank failure, such as adequate spacing between various tanks, and adequate reporting or monitoring of the content of those tanks;

28

**CLASS ACTION COMPLAINT AND JURY DEMAND**

      i.    failing to implement sufficient protocols to prevent the risk of an incident with one tank expanding to implicate other tanks; and

      j.    failing to utilize storage a tank with a sufficient design and/or maintained ability to withstand and/or prevent a thermal runaway event.

170.    When properly handled, stored, and maintained, MMA will not cause a runaway polymerization event that threatens leak or explosion or otherwise necessitates emergency evacuation.

171.    Defendants' failures to safely store and maintain the MMA tanks at their facility were an actual and proximate cause of harm to the Plaintiff and Proposed Class members. Defendants' failures led to the emergency conditions which necessitated the evacuation of 50,000 California residents, including the threat of an imminent chemical spill or explosion.

172.    As a result of Defendants' breaching their duties, Plaintiff and the Class incurred substantial harms as alleged herein. These harms included, among other things, the lost use and enjoyment of their homes, the costs and expenses associated with evacuation (shelter, travel, food and basic necessities, childcare), lost wages, property damage (including reduced property value), and other related harm.

173.    Plaintiff's and Proposed Class members' injuries and damages were foreseeable consequences of Defendants' negligent conduct. Defendants knew or reasonably should have known that failure to properly store MMA and failure to take safety precautions to mitigate the risk of a thermal runaway event could lead to threatened or actual tank failure or explosion, which would put everyone in the surrounding communities in harms' way, necessitating protective measures like evacuation. MMA's hazards and propensity for polymerization are well-documented issues, and the risks of an event like this are well known. There have been several well documented instances of the same type of crises at plants storing MMA, which further placed Defendants on notice of the risks of improper storage and the importance of maintaining adequate safety features and procedures.

174.    As a result of Defendants' conduct as alleged herein, Plaintiff and Proposed Class members seek all relief to which they are entitled at law and/or equity, specifically including

**CLASS ACTION COMPLAINT AND JURY DEMAND**

compensatory, punitive/exemplary, and all other damages. Plaintiff and Proposed Class members further seek injunctive and/or equitable relief, and any other relief the Court may deem appropriate. Plaintiff seeks an injunction requiring Defendants to discontinue the continued nuisance of unsafe chemical storage by undertaking measures necessary to ensure the safe handling, storage, and use of dangerous materials.

## COUNT II

### Private Nuisance, Cal. Civ. Code § 3479

Plaintiff and the Class Against All Defendants

175.   Plaintiff realleges and incorporates by reference each and every allegation in this complaint as if fully set forth herein.

176.   Plaintiff and Proposed Class members are resident occupants of, and/or controlled real property within the mandatory-evacuation zones in Orange County, California.

177.   Defendants' acts and omissions created a private nuisance by creating conditions which constituted an obstruction to Plaintiff's, and the Class's free use of their property and has substantially and unreasonably interfered with Plaintiff's and the Proposed Class members' use and enjoyment of their property. Defendants' failure to properly store and maintain MMA led to the mass emergency evacuation orders of around 50,000 residents, and rendered schools and businesses inoperable. Due to the evacuation orders, Plaintiff and the Proposed Class members were unable to use or enjoy their property within the evacuation zone. They were forced to flee their homes to seek safety and could not use or enter their property for a period of up to five days during the duration of the mandatory-evacuation orders.

178.   Defendants, through their acts and/or failures to act, created conditions to exist that 1) were harmful to health; 2) were indecent and/or offensive to the senses; 3) were an obstruction to the free use of property; 4) interfered with the comfortable enjoyment of life and property; and 5) were a potentially dangerous condition to the property of Plaintiff and the Proposed class.

179.   Defendants' acts and/or omissions which created these emergency conditions were intentional and unreasonable, or alternatively negligent or reckless, and the condition that Defendants created was the result of an abnormally dangerous activity.

30

**CLASS ACTION COMPLAINT AND JURY DEMAND**

180. Defendants' failure to take adequate precautions to protect against the risk of chemical leak or explosions was unreasonable given the well-documented and well-known hazards of MMA storage. Alternatively, Defendants' failure to take these precautions amounted to negligence, as reasonable companies in their position would have acted to better protect against the risks associated with MMA storage. Alternatively, and/or in addition, storing MMA, a highly hazardous and volatile chemical, near a residential corridor constitutes an abnormally dangerous activity, and the conditions that Defendants created were a direct result of this activity.

181. An ordinary person would reasonably be annoyed or disturbed by the conditions caused by Defendants' conduct, including being forced from their home into temporary shelter that was costly, deeply uncomfortable, disconcerting, and/or unavailable. In fact, here, residents of Garden Grove were disturbed by Defendants' conduct and demanded that GKN be held accountable and that GKN's Garden Grove facility be permanently closed at a community meeting held the evening of May 26, 2026.

182. Plaintiff and Proposed Class members did not consent to Defendants' conduct.

183. Plaintiff and Proposed Class members were harmed as a result of Defendants' conduct. Defendants' failure to properly and safely store MMA and their failure to properly maintain their storage tanks was a substantial cause of the emergency conditions which prompted the evacuation orders at issue. Due to these evacuation orders, Plaintiff and Proposed Class members were unable to use or enjoy their property. As a result, they incurred losses of wages, loss of use costs of food, travel, and shelter, property damages (including lost property value), and other similar harms.

184. The seriousness of 50,000 people being forced to evacuate and flee their homes and businesses due to a risk of exposure to a toxic chemical or explosion outweighs the public benefits of Defendants' storage and maintenance of their chemical stock, without taking adequate preventative and/or precautionary measures.

185. Defendants' conduct was despicable and consciously disregarded industry-wide knowledge about the dangers and risks of MMA storage, and widely published guidance on safety procedures for preventing thermal runaway events. Thus, Defendants' conduct was carried on with

31

**CLASS ACTION COMPLAINT AND JURY DEMAND**

malice. Furthermore, it was authorized, ratified, and approved by Defendants' officers, directors, and managing agents.

186.    Furthermore, by exposing Plaintiff and Proposed Class members to emergency conditions, which forced them to flee their homes, Defendants' conduct subjected them to cruel and unjust hardship in knowing disregard of their rights to enjoy their real property, meaning that Defendants' conduct also rises to the level of oppression.

187.    Plaintiff and Proposed Class members are thus entitled to punitive damages.

188.    As a result of Defendants' conduct as alleged herein, Plaintiff and Proposed Class members seek all relief to which they are entitled at law and/or equity, specifically including compensatory, punitive/exemplary, and all other damages. Plaintiff and Proposed Class members further seek injunctive and/or equitable relief, and any other relief the Court may deem appropriate. Plaintiff seeks an injunction requiring Defendants to discontinue the continued nuisance of unsafe chemical storage by undertaking measures necessary to ensure the safe handling, storage, and use of dangerous materials.

## COUNT III

### Public Nuisance, Cal. Civ. Code §§ 3479, 3480, 3493

Plaintiff and the Class Against All Defendants

189.    Plaintiff realleges and incorporates by reference each and every allegation in this complaint as if fully set forth herein.

190.    A public nuisance is anything which is harmful to health, indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property that affects at the same time, an entire community or neighborhood, or any considerable numbers of persons, as defined by California Civil Code § 3479 and 3480.

191.    Through their improper maintenance and storage of MMA, Defendants created emergency conditions, which exposed the surrounding communities and residents therein to the risk of toxic chemical exposure and explosion. These conditions not only exposed these communities to the hazards of MMA, but also necessitated mass emergency evacuation orders,

**CLASS ACTION COMPLAINT AND JURY DEMAND**

resulting in the closure of roads, public spaces, businesses, and the inaccessibility of people's homes.

192. These conditions disrupted a substantial number of people living and working in neighborhoods in the Garden Grove, Stanton, Cypress, Anaheim, Buena Park, and Westminster communities and nearby areas. These conditions were injurious to public health, offensive to the senses, and an obstruction to the free use of property in the affected communities.

193. Defendants' conduct interfered with the rights of Plaintiff and the Proposed Class by preventing them from the use and enjoyment of their property and forcing them to evacuate from the area. As a result, they incurred losses of wages, costs of food, travel, and shelter, property damages (including lost property value), and other similar harms.

194. In addition to interfering with property rights of the Plaintiff and Proposed Class, Defendants' conduct interfered with the rights of the general public. These rights include the right to travel in the area, the right to use public spaces and attend public schools, and the public's right to health, safety, and comfort.

195. Additionally, the emergency conditions created by Defendants obstructed the free passage and use of public parks, highways, squares and streets.

196. The interferences caused by Defendants' conduct were substantial, unreasonable, and harmful to the public at large, but were harmful in greater kind and degree to Plaintiff and the Proposed Class.

197. These interferences would be highly offensive to an ordinary reasonable person, and an ordinary reasonable person would be annoyed, disturbed, and/or alarmed by them.

198. Plaintiff and Proposed Class suffered injuries and damages different in kind than the general public. The general public suffered from the inability to patronize businesses or utilize public schools in the area affected by evacuations, enter the area for work, pass through the area to travel or for recreation. In contrast, Plaintiff and Proposed Class members' lives were upended when they were unable to access or use their own property, were forced to flee their homes, seek emergency shelter, and suffered a risk of chemical exposure or injury to themselves or their property by a possible explosion or leak.

33

**CLASS ACTION COMPLAINT AND JURY DEMAND**

199.    Defendants' conduct was despicable and consciously disregarded industry-wide knowledge about the dangers and risks of MMA storage, and widely published guidance on safety procedures for preventing thermal runaway events. Thus, Defendants' conduct was carried on with malice. Furthermore, it was authorized, ratified, and approved by Defendants' officers, directors, and managing agents.

200.    Furthermore, by exposing Plaintiff and Proposed Class members to emergency conditions, which forced them to flee their homes, Defendants' conduct subjected them to cruel and unjust hardship in knowing disregard of their rights to enjoy their real property, meaning that Defendants' conduct also rises to the level of oppression.

201.    Plaintiff and Proposed Class members are thus entitled to punitive damages.

202.    As a result of Defendants' conduct as alleged herein, Plaintiff and Proposed Class members seek all relief to which they are entitled at law and/or equity, specifically including compensatory, punitive/exemplary, and all other damages. Plaintiff and Proposed Class members further seek injunctive and/or equitable relief, and any other relief the Court may deem appropriate. Plaintiff seeks an injunction requiring Defendants to discontinue the continued nuisance of unsafe chemical storage by undertaking measures necessary to ensure the safe handling, storage, and use of dangerous materials.

## COUNT IV

### Strict Liability for Ultrahazardous Activity

Plaintiff and the Class Against All Defendants

203.    Plaintiff realleges and incorporates by reference each and every allegation in this complaint as if fully set forth herein.

204.    Defendants were engaged in the ultrahazardous activity of the use and storage of MMA and other hazardous chemicals, which caused Plaintiff and Proposed Class members to be harmed, and Defendants are responsible for that harm, meaning they are subject to strict liability for the damages caused to Plaintiff and Proposed Class members.

205.    The use, storage, maintenance, processing, monitoring, and maintaining of MMA and other hazardous and unstable chemicals in close proximity to residential neighborhoods,

34

**CLASS ACTION COMPLAINT AND JURY DEMAND**

schools, businesses, and public recreational areas, constitutes an ultrahazardous or abnormally dangerous activity.

206.     Defendants' activities carried a high degree of risk of harm to the property and persons in the area surrounding Defendants' facility, and it is likely that the harm resulting from these activities will be great. As discussed, the storage of MMA comes with well-known risks. Because of its tendency to self-polymerize, storing and maintaining MMA carries the risk that the volatile chemical will undergo the reaction it did here, exposing the people and properties in the surrounding area to either a chemical spill, a cloud of toxic vapors, or a storage tank explosion. The harm resulting from exposure to toxic chemicals, or a storage tank explosion would necessarily be great, as these risks carry a high propensity to cause injuries to people's health (necessitating evacuation), or major property damage.

207.     Despite, and in the alternative to, Defendants' negligence, these risks cannot be fully eliminated through the exercise of reasonable care. Even where adequate safety measures and precautions are in place, MMA's tendency to self-polymerize means that any number of foreseeable errors or failures can allow the chemical to begin polymerizing and can lead to a thermal runaway event. For example, as soon as the inhibitor is depleted in a storage tank containing MMA, a polymerization event can be initiated when MMA reacts with any number of contaminants. Then, if a human error or equipment failure occurs, the storage tank can overheat and become pressurized, presenting the risk of failure or explosion. Because of this, storing and maintaining large quantities of MMA near residential or populated areas will always carry a risk of harm.

208.     The bulk storage of MMA for Defendants' purposes in close proximity to residential and populated spaces is not a matter of common usage.

209.     The high risk of harm associated with Defendants' conduct is rendered even more inappropriate where it was done near a residential corridor and in close proximity to homes, businesses, schools, and public recreation sites.

210.     The value of Defendants' large-scale storage of MMA to the community is vastly outweighed by its dangerous attributes. Defendants' MMA storage and maintenance practices do

35

**CLASS ACTION COMPLAINT AND JURY DEMAND**

not benefit the surrounding communities, but pose a high level of physical and financial harm to their persons, homes, properties, and businesses.

211.   Defendants' bulk storage of MMA was a substantial factor in the harms Plaintiff and Proposed Class Members suffered. Defendants' storage and maintenance of MMA was the direct cause of the emergency conditions at their facility, which resulted in the evacuation orders that required Plaintiff and Proposed Class Members to flee their homes, and incur the costs and damages associated with that evacuation and their inability to access their homes, livelihoods, and properties. These harms were the kind of harms that would be anticipated because of the risk created by the storage of MMA and other hazardous and volatile chemicals. Where these unstable chemicals pose such a high risk of the release of chemicals into the community or explosion, the evacuation of the surrounding communities is a foreseeable necessary safety measure.

212.   Because Defendants were engaged in an ultrahazardous activity which harmed Plaintiff and Proposed Class Members, they are strictly liable for Plaintiff's and Proposed Class Members' injuries, regardless of the level of care exercised and irrespective of Defendants' substantial failures.

213.   As a result of Defendants' conduct as alleged herein, Plaintiff and Proposed Class members seek all relief to which they are entitled at law and/or equity, specifically including compensatory, punitive/exemplary, and all other damages. Plaintiff and Proposed Class members further seek injunctive and/or equitable relief, and any other relief the Court may deem appropriate. Plaintiff seeks an injunction requiring Defendants to discontinue unsafe chemical storage to the extent it cannot do so safely.

## COUNT V

**California's Unfair Competition Law, Business and Professions Code Section 17200 *et seq.*:**

**Unlawful Prong**

Plaintiff and the Class Against All Defendants

214.   Plaintiff realleges and incorporates by reference each and every allegation in this complaint as if fully set forth herein.

36

**CLASS ACTION COMPLAINT AND JURY DEMAND**

COULSON P.C.

215.    California's Unfair Competition Law ("UCL"), Business and Professions Code sections 17200 et seq., prohibits any "unlawful, unfair or fraudulent business act or practice."

216.    Defendants' improper storage and management of MMA constituted an unlawful business act because it violated constitutional, statutory, regulatory, and/or common-law duties, which can each serve as the foundation of this UCL claim.   These include, but are not limited to California environmental, hazardous-materials, public-safety, and nuisance laws.

217.    Defendants conduct violated, among other things, California's prohibition on creating public and private nuisances; California Code of Regulations Title 8, § 5164 (requiring that hazardous substances be stored in a container which is appropriate for the type and quantity of the hazardous substance, that containers of hazardous substances not be stored in such locations or manner as to result in physical damage to, or deterioration of, the container, and that containers shall not be stored where they are exposed to heat sufficient to rupture the containers or to cause leakage), Title 19, Division 5, Chapter 1; Title 19, Division 5, Chapter 2, § 5090.5 (requiring an owner or operator of a stationary source handling more than a threshold quantity of a regulated substance, to prepare and implement written procedures to maintain the on-going mechanical integrity of process equipment, train each employee to maintain the on-going mechanical integrity of the process, and to perform or cause to be performed inspections and tests on process equipment, which follow recognized and generally accepted good engineering practices and are performed at a frequency that is consistent with applicable manufacturers' recommendations, industry standards or codes, good engineering practices and prior operating experience), § 5100.5 (requiring an owner or operator to inspect and test process equipment including storage tanks, relief and vent systems and devices, emergency shutdown systems and controls including monitoring devices and sensors, and requiring them to correct deficiencies in equipment), California Code of Health and Safety § 25531.2(b) (requiring owners and operators of stationary sources producing, processing, handling, or storing hazardous materials to identify hazards that may result from releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking those steps as are necessary to prevent releases, and to minimize the consequences of accidental releases that do occur), 29 U.S. Code § 654 (requiring employers to furnish each employee a place of employment

**CLASS ACTION COMPLAINT AND JURY DEMAND**

COULSON P.C.

which is free from hazards that are likely to cause death or serious harm to his employees), California Labor Code § 6400 (requiring that employers furnish a place of employment that is safe and healthful for the employees therein).

218. Defendants' unlawful conduct includes, but is not limited to failure to exercise due care in the storage, maintenance, inspection, and management of MMA at their facility, their creation of both a public and private nuisance through their acts and omissions at their facility, their failure to maintain adequate safety procedures and measures for preventing and mitigating the risk of MMA storage tank failure, and violations of the California Code of Regulations, the California Health and Safety Code, the California Accidental Release Prevention Program Statute, the Hazardous Materials Business Plan program, other State and local public health and environmental regulations related to the storage of hazardous chemicals, as well as violations of various permits.

219. Plaintiff and Proposed Class Members suffered financial injury as a result of Defendants' unlawful business practices, and Defendants' unlawful business practices were a substantial cause of these injuries. Defendants' unlawful MMA storage, maintenance, and inspection practices caused the emergency conditions which necessitated the mandatory evacuation orders which required Plaintiff and Proposed Class Members to flee their property, homes, and businesses to find safety. As a result of these mandatory evacuation orders, Plaintiff and Proposed Class members suffered financial harm in the form of lost wages, lost business revenue, and the cost of transportation, food, shelter, and childcare.

220. Pursuant to Business and Professions Code 17200 et seq., Plaintiff and Proposed Class members seek and are entitled to injunctive relief, abatement-related relief, all other available relief under the relevant section of the code, and such other relief as the court may deem appropriate. Plaintiff seeks an injunction requiring Defendants to discontinue the continued nuisance of unsafe chemical storage by undertaking measures necessary to ensure the safe handling, storage, and use of dangerous materials.

**CLASS ACTION COMPLAINT AND JURY DEMAND**

**COUNT VI**

**California's Unfair Competition Law, Business and Professions Code Section 17200 et seq.:**

**Unfairness Prong**

Plaintiff and the Class Against All Defendants

221.    Plaintiff realleges and incorporates by reference each and every allegation in this complaint as if fully set forth herein.

222.    Defendants' improper storage and maintenance of MMA constitutes an unfair business practice under California's Unfair Competition Law (UCL).

223.    In addition to the reasons for which it was unlawful, as outlined in count V, Defendants' conduct offended established public and regulatory policies established for the protection of public health and safety, and the environment. For example, by improperly storing and maintaining MMA, a hazardous chemical, Defendants offended "California's strong public policy of protecting the environment" as expressed in caselaw, as well as the California Constitution (Article X Section 2, Article I Section 1, Article I Section 25),

224.    Defendants' conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiff, the Proposed Class Members, and the public. Defendants acted immorally, unethically, oppressively, and unscrupulously, by failing to take adequate measures to properly store and handle MMA, in close proximity to residential neighborhoods, homes, businesses, schools, and places of public recreation, thereby putting the public, Plaintiff, and Proposed Class Members in great risk of harm.

225.    Defendants' failures were substantially injurious to Plaintiff, the Proposed Class Members, and the public. As a result of Defendants' business practices, which caused the emergency conditions at issue, Plaintiff and Proposed Class Members were threatened by the risk of chemical exposure or a storage tank explosion, subject to mandatory evacuation orders, were forced to flee their homes, and were unable to access or use their homes, properties and businesses. They suffered financial harms in the form of the costs of travel, shelter, food, childcare, lost wages, and lost use and/or diminishment of their property values. Thus, Plaintiff and Proposed Class Members were deprived of money or property to which they had a cognizable claim, and were

**CLASS ACTION COMPLAINT AND JURY DEMAND**

forced to enter into various transactions, costing money, that would have been unnecessary if not for Defendants' unfair conduct.

226. The general public suffered from deprivation of access to properties and services to which they were entitled, interference with their right to travel, and the inability to enter the affected area for activities like school, work, travel, recreation, or business.

227. The harms Plaintiff and Proposed Class Members suffered outweighed any utility associated with Defendants' conduct. The utility associated with Defendants' improper maintenance, storage, and inspection of MMA can only be the costs the Defendants saved by cutting corners. In comparison, Plaintiff and Proposed Class Members were displaced, unable to access their homes and businesses for up to five days and were living with the fear of an impending and seemingly inevitable chemical spill or explosion.

228. Pursuant to Business and Professions Code 17200 et seq., Plaintiff and Proposed Class members seek and are entitled to injunctive relief, abatement-related relief, all other available relief under the relevant section of the code, and such other relief as the court may deem appropriate. Plaintiff seeks an injunction requiring Defendants to discontinue the continued nuisance of unsafe chemical storage by undertaking measures necessary to ensure the safe handling, storage, and use of dangerous materials.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that the Court:

A. Certify the Class, name Plaintiff as representatives of the Class, and appoint Plaintiff's counsel as Class Counsel;

B. Enter a judgment in favor of the Plaintiff and the Class;

C. Award Plaintiff and the Class actual, compensatory, statutory, and/or punitive damages as allowable by law and in an amount to be determined at trial;

D. Award Plaintiff and the Class restitution and/or all other forms of equitable monetary relief as may be appropriate;

E. Order injunctive relief as pleaded or as the Court may deem proper;

**CLASS ACTION COMPLAINT AND JURY DEMAND**

F.  Enter an award of pre- and post-judgment interest;

G.  Award reasonable attorneys' fees, expenses, and costs; and

H.  Award such further relief as may be just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 4, 2026

**COULSON P.C.**

*/s/ Nicholas A. Coulson*
Nicholas A. Coulson (SBN 358903)
Nick@CoulsonPC.com
Ellyn Gendler (SBN 305604)
EGendler@CoulsonPC.com
300 River Place Drive
Suite 1700
Detroit, Michigan 48207
T: (313) 644-2685

*Attorneys for Plaintiff and the Putative Class*

**CLASS ACTION COMPLAINT AND JURY DEMAND**